**OPINION**



IN THE

# Court of Appeals of Indiana

James T. Morgan,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner.*



FILED

Feb 09 2024, 8:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

February 9, 2024

Court of Appeals Case No.
23A-CR-1489

Appeal from the
Montgomery Superior Court

The Honorable
Heather L. Barajas, Judge

Trial Court Cause No.
54D01-2304-RF-1224

**Opinion by Senior Judge Shepard**
Judges Brown and Pyle concur.

**Shepard, Senior Judge.**

# Statement of the Case

In 2005, Indiana adopted a "Red Flag Law" authorizing the seizure of firearms from demonstrably dangerous individuals. It did so in response to the death of Indianapolis Officer Jack Laird the year before.

This case tests the level of evidence necessary to support such a seizure. The Montgomery County Sheriff's Department ("MCSD") seized firearms and ammunition from James Morgan while investigating a domestic dispute. Morgan appeals the trial court's judgment ordering MCSD to retain the seized firearms and ammunition. Concluding the trial court did not err, we affirm.

# Issues

Morgan raises two issues, which we restate as:

    I.     Whether the trial court erred in admitting evidence.

    II.    Whether there is sufficient evidence to sustain the trial court's judgment.

# Facts and Procedural History

On April 19, 2023, Morgan was at home with his children, whom the record does not identify; his fiancée Brooke Geller; Brooke's daughter Kayleigh Geller;

and Elly Benjamin, who was in a relationship with Brooke's son Michael Geller.[1] Morgan and Benjamin argued about who was responsible for a dog kept at the house. Brooke was "upset" and expressed disapproval of Morgan's argumentative behavior. Tr. Vol. 2, p. 68.

[5] Benjamin went outside and met Kayleigh, who had gone for a walk. Benjamin and Kayleigh drove away from the house but returned a short time later with Michael, who went inside while Kayleigh and Benjamin stayed outside. Next, Morgan walked outside, wielding a handgun. He had a second handgun "in his pocket," *id*. at 51, and was carrying a shotgun on his back. Morgan approached the car, waving the handgun "back and forth" as he cursed, yelled, and ordered Kayleigh and Benjamin to leave. *Id*. at 35. Brooke rushed outside barefoot and told Benjamin, "just go, right now just go." *Id*. at 70. Kayleigh became frightened and called 911 as they drove away. She texted her mother to inform her she had called 911.

[6] Deputy Shelby Curtis of the Montgomery County Sheriff's Office was dispatched to investigate a domestic disturbance at the home. He wore a body camera. Several other officers were present when Deputy Curtis arrived. Some of them had drawn their weapons, including rifles, because Morgan was still holding a handgun as he stood outside the house. Morgan was arguing with

---

[1] We refer to Brooke, Kayleigh, and Michael by their first names to avoid confusion.

Brooke, who yelled at him to drop the handgun. The deputy told Brooke to walk away.

[7] Morgan temporarily went out of Deputy Curtis's sight, and he did not have the handgun when he returned. The deputy ordered Morgan to walk backwards toward him and get on his knees, and Morgan complied. Deputy Curtis handcuffed Morgan and questioned him. As they talked, the deputy noted Morgan was "[u]nstable" and "not cooperative" with questioning. *Id.* at 14. Morgan cursed at the officers and told them they "didn't need to be there." *Id.* He angrily refused to tell Deputy Curtis where he had put the handgun, telling the deputy it was none of his business. When Deputy Curtis asked Morgan about a report of an argument, Morgan said he would "plead the Fifth." Tr. Vol. III, State's Ex. 2 at 6:54. He also repeatedly said his children were in the house and expressed anger when officers entered it to perform a search. At one point, Morgan walked away from Deputy Curtis, defying his orders, and only stopped moving after the deputy physically directed him to sit down. The deputy told Morgan he did not want anyone to get hurt, including Morgan, and Morgan responded "I don't give a f**k. Hurt me." *Id.* at 8:27.

[8] Next, Deputy Curtis interviewed other residents of the home. Brooke, who was crying and upset, said Morgan was "mentally unstable" and had been hospitalized in the past. Tr. Vol. 2, p. 17. She also told the deputy Morgan had refused to take his prescribed medications. Brooke next said she was scared of Morgan "at times" because she was "not sure what he's capable of." *Id.* at 18. And Brooke informed Deputy Curtis that Morgan had threatened to shoot if

officers arrived because "he wasn't going to jail." *Id*. Finally, Brooke said Morgan "needed help." *Id*. at 62.

[9] At the end of the investigation, the officers seized the following: two handguns, four shotguns, one muzzleloader rifle, two .22 caliber rifles, and two .223 AR rifles, along with ammunition. On April 20, 2023, Deputy Curtis filed an affidavit of probable cause listing the firearms and ammunition the officers had seized. He explained the officers seized the items "for the safety of the family and others . . . using the 'red flag law.'" Appellant's App. Vol. 2, p. 9.

[10] The trial court held an evidentiary hearing on the MCSD's seizure of the firearms. During the hearing, the State, without objection from Morgan, played a five-minute-long portion of Deputy Curtis's body camera recording, which showed the deputy's interaction with Morgan. In addition, Brooke testified Morgan was having "a manic episode" following a "bad night," during which he experienced night terrors. Tr. Vol. 2, p. 59. Next, she said she manages Morgan's medications, including for "schizophrenic tendencies." *Id*. Brooke further acknowledged Morgan had a prior conviction of domestic battery against her. She claimed all of the firearms and ammunition belonged to her,[2] and she said they could be released to her father-in-law.

---

[2] She further stated some of the firearms had been "[g]ifts" for Morgan, but they were "all registered in [her] name." *Id*. at 64. In any event, she allowed Morgan "full access" to the firearms. *Id*.

At the end of the hearing, the trial court stated, "there's clear and convincing evidence that . . . Mr. Morgan is an individual who is likely to pose – who will present a risk of personal injury to himself or to another individual in the future, and that specifically on April 19 he did present a risk of harm to himself or another individual." *Id*. at 85. The court declined to release the firearms to a third party, noting Brooke's father-in-law had not appeared in court to confirm he would take custody of them. Later, the court issued an order stating:

> The court FINDS that JAMES T. MORGAN . . . is a 'dangerous' person within the meaning of I.C. 35-47-14-1 in that he presents an imminent risk of personal injury to himself or another individual, and it is probable he may present such a risk to himself or another individual in the future and is the subject of documented evidence that would give rise to the belief that he has a propensity for violence or emotionally unstable conduct.
>
> The court FINDS that [the firearms and ammunition] were properly seized April 19, 2023 from James T. Morgan by the Montgomery County Sheriff's Department pursuant to I.C. 35-47-14-1 et. seq. and shall be retained by that department pursuant to statute until further order of this court.
>
> The court ORDERS that James T. Morgan's ability to register a firearm in the State of Indiana is suspended until further order of the court.

Appellant's App. Vol. 2, p. 13. This appeal followed.

## Discussion and Decision

### I. Admission of Evidence

Morgan argues the trial court erred in allowing Deputy Curtis to testify about statements Brooke made to him, claiming the statements were inadmissible hearsay. "Whether to admit or exclude evidence is a determination entrusted

to the sound discretion of the trial court." *Mundy v. Angelicchio*, 623 N.E.2d 456, 460 (Ind. Ct. App. 1993). "We will reverse the trial court's decision to admit evidence for an abuse of discretion only when it is clearly erroneous and against the logic and effect of the facts and circumstances or the reasonable inferences to be drawn therefrom." *Id*.

[13] Hearsay is "a statement that . . . is not made by the declarant while testifying at the trial or hearing; and . . . is offered in evidence to prove the truth of the matter asserted." Ind. Evid. Rule 801(c). Hearsay is generally inadmissible, subject to exceptions set forth in the Indiana Rules of Evidence or in other law. Ind. Evid. Rule 802.

[14] "A statement relating to a startling event or condition, made while the declarant was under the stress of excitement" caused by the event or condition, is "not excluded by the rule against hearsay . . . ." Ind. Evid. Rule 803(2). Such a statement is known as an "excited utterance." *See id*. "For a hearsay statement to be admitted as an excited utterance, three elements must be shown: (1) a startling event, (2) a statement made by a declarant while under the stress of excitement caused by the event, and (3) that the statement relates to the event." *Davenport v. State*, 749 N.E.2d 1144, 1148 (Ind. 2001). "Determining whether a statement constitutes an excited utterance is essentially a factual determination subject to a clearly erroneous standard of review, sometimes described as [] functionally equivalent [to] abuse of discretion." *Id.*

[15] Morgan argues the State failed to show Brooke was still under stress when she spoke with Deputy Curtis. In particular, he claims the deputy did not speak with Brooke until he had been at the home for fifteen minutes, implying any stress had dissipated by then. Morgan's claim lacks evidentiary support because he cites a portion of the deputy's body camera recording that was not played for the trial court during the evidentiary hearing. We will not reverse the court's ruling via evidence not presented to the court. *See Brendenwood Common v. Kahlenbeck*, 421 N.E.2d 421, 421 (Ind. Ct. App. 1981) (refusing to consider affidavit presented for the first time on appeal), *on reh'g*, *trans. denied*.

[16] In any event, Deputy Curtis's interaction with Brooke occurred shortly after Brooke had witnessed her fiancé angrily wielding a firearm while yelling at her daughter and her son's girlfriend, followed swiftly by her fiancé having an armed confrontation with several officers, during which Brooke had told her fiancé to put down the handgun. Brooke appeared to be upset and cried as she spoke with the deputy. This evidence supports a conclusion Brooke was still under the stress of the event when she spoke with Deputy Curtis. *See Holmes v. State*, 480 N.E.2d 916, 918 (Ind. 1985) (no error in admission of officer's description of witness's statement; witness had seen a shooting several minutes prior and was still emotionally distraught).

[17] Next, Morgan claims Brooke's statements to the deputy did not relate to Morgan's armed confrontations with her daughter and the police. We disagree. Brooke told the officers about Morgan's mental health history, his refusal to take his medication, and his need for help. Brooke also said she was scared of

Morgan. These statements related to Morgan's recent frightening behavior while armed. *See Stinson v. State*, 126 N.E.3d 915, 921 (Ind. Ct. App. 2019) (no error in admitting witness's descriptions of another person's statements; the person had witnessed a stabbing, and the statements about who committed the stabbing related to the event). The trial court did not abuse its discretion in admitting Deputy Curtis's testimony about Brooke's statements to him.

## II. Retention of Firearms and Ammunition

[18] Morgan claims the trial court's order directing the MCSD to retain the firearms and ammunition lacks sufficient evidentiary support. When "a law enforcement officer seizes a firearm from an individual whom the law enforcement officer believes to be dangerous" without first obtaining a warrant, the officer must submit an affidavit to a circuit or superior court describing why the officer believes the individual is dangerous. Ind. Code § 35-47-14-3(a) (2020). If the court finds probable cause exists to believe the individual is dangerous, the court shall order the law enforcement agency to retain the firearm. I.C. § 35-47-14-3(d). The court shall next conduct an evidentiary hearing. Ind. Code § 35-47-14-5(a) (2019). At the hearing, the State must prove "by clear and convincing evidence" material facts demonstrating the individual is dangerous. Ind. Code § 35-47-14-6(b) (2020).

[19] "The clear and convincing evidence standard is an intermediate standard of proof greater than a preponderance of the evidence and less than proof beyond a reasonable doubt." *K.H. v. M.M.*, 151 N.E.3d 1259, 1267 (Ind. Ct. App. 2020), *trans. denied*. "In order to be clear and convincing, the existence of a fact

must be highly probable." *Commitment of B.J. v. Eskenazi Hosp./Midtown CMHC*, 67 N.E.3d 1034, 1038 (Ind. Ct. App. 2016). As the Indiana Supreme Court has stated:

> [I]n reviewing a judgment requiring proof by clear and convincing evidence, an appellate court may not impose its own view as to whether the evidence is clear and convincing but must determine, by considering only the probative evidence and reasonable inferences supporting the judgment and without weighing evidence or assessing witness credibility, whether a reasonable trier of fact could conclude that the judgment was established by clear and convincing evidence.

*In re Guardianship of B.H.*, 770 N.E.2d 283, 288 (Ind. 2002).

[20] In the context of proceedings for the seizure and retention of firearms, the General Assembly has defined "dangerous" as follows:

> (a) . . . an individual is 'dangerous' if:
>
> (1) the individual presents an imminent risk of personal injury to the individual or to another individual; or
>
> (2) It is probable that the individual will present a risk of personal injury to the individual or to another individual in the future and the individual:
>
> (A) has a mental illness (as defined in IC 12-7-2-130) that may be controlled by medication, and has not demonstrated a pattern of voluntarily and consistently taking the individual's medication while not under supervision; or
>
> (B) is the subject of documented evidence that would give rise to a reasonable belief that the individual has a propensity for violent or suicidal conduct.

> (b) The fact that an individual has been released from a mental health facility or has a mental illness that is currently controlled by medication does not establish that the individual is dangerous for the purposes of this chapter.

Ind. Code § 35-47-14-1 (2019).

[21] We focus our analysis on subsection (a)(2) of the statute. Based on a plain reading of the text, the State must prove an individual "will present a risk of personal injury to the individual or to another individual in the future" and then also prove circumstances supporting either subsection (a)(2)(A) or subsection (a)(2)(B). *Id.*; *see also West v. Off. of Ind. Sec'y of State*, 54 N.E.3d 349, 353 (Ind. 2016) (courts "start with the plain language of the statute, giving its words their ordinary meaning and considering the structure of the statute as a whole").

[22] Here, after experiencing night terrors and refusing to take his prescribed medicine for only one day, Morgan escalated an argument over a dog to the point of waving a handgun while yelling and cursing at Benjamin and Kayleigh. He was also armed with another handgun and a shotgun. Brooke was so frightened she rushed outside barefoot and told Benjamin and Kayleigh to "just go, right now just go." Tr. Vol. 2, p. 70. And Kayleigh called 911 because she was also scared.

[23] When the police arrived, Morgan at first refused to put down his handgun despite being confronted by multiple heavily armed officers, choosing instead to step out of view and return without it. He then refused to tell the officers where he had put it. Morgan was also argumentative and attempted to walk away

from Deputy Curtis during questioning until the deputy physically directed him to sit down. Brooke later told Deputy Curtis she was scared of Morgan "at times" because she was "not sure what he's capable of." *Id*. at 18. And Morgan was "mentally unstable," *id*. at 17, and "needed help," *id*. at 62. She also said Morgan had threatened to shoot the officers.

[24] Morgan argues he does not pose a probable future risk of harm to himself or others because Brooke, Benjamin, and Michael testified they trust him to not repeat his behavior. Morgan also notes Brooke said he is now taking his medication reliably. Finally, Morgan claims he allowed the officers to handcuff him and spoke with them in a "logical" manner, thus demonstrating some degree of reasonableness. Appellant's Br. p. 15. These arguments amount to a request to reweigh the evidence, which our standard of review forbids. *B.H.*, 770 N.E.2d at 288. The trial court could reasonably conclude the State established, by clear and convincing evidence, a probability Morgan will present a risk of personal injury to himself or to another individual in the future for purposes of Indiana Code section 35-47-14-1(a)(2).

[25] We next consider whether there is clear and convincing evidence to show Morgan "is the subject of documented evidence that would give rise to a reasonable belief that the individual has a propensity for violent or suicidal conduct." Ind. Code § 35-47-14-1(a)(2)(B). Morgan has a prior conviction of misdemeanor domestic violence against Brooke, the owner of the firearms and

ammunition in question.[3] Further, when Deputy Curtis told Morgan he did not want to see him get hurt, Morgan, who appeared to be unstable, said he did not care and asked the deputy to hurt him. We also note Brooke testified that Morgan's refusal to take his medication, which led to his angry armed confrontation, was related to his ongoing "night terrors," which she described as provoking a "manic episode." Tr. Vol. 2, p. 59. Brooke did not say Morgan's night terrors and manic episodes had stopped, merely that he was taking his medication. This evidence demonstrates a high probability Morgan has a propensity for violent or suicidal conduct.[4] *See Redington v. State*, 992 N.E.2d 823, 845 (Ind. Ct. App. 2013) (affirming order for police to retain Redington's firearms; Redington was taking anti-psychotic medication at the time of the hearing, but he still experienced symptoms that could lead to potentially dangerous behavior), *trans. denied*.

[26] Morgan argues the trial court should have released the firearms to a third party. If a court orders a law enforcement agency to retain a person's firearm, the person "may petition the court to order the law enforcement agency to . . . transfer the firearm to a responsible third party . . . ." Ind. Code § 35-47-14-10(a)(1) (2019). But the proposed third party must express willingness to "enter

---

[3] We do not hold a prior conviction for domestic battery or a similar offense will always support a determination an individual has a propensity for violent conduct. But Morgan's conviction is a pertinent piece of evidence here.

[4] We need not determine whether the trial court's order is supported by clear and convicting evidence under Indiana Code section § 35-47-14-1(a)(1).

into a written court agreement" to accept the firearm. Ind. Code § 35-47-14-1.5(3) (2019). Here, Brooke stated her father-in-law could take possession of the firearms and ammunition, but he did not personally appear and state he would enter into a written agreement. Morgan's third-party claim must fail because he did not comply with the plain language of Indiana Code section 35-47-14-1.5(3).

## Conclusion

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

Brown, J., and Pyle, J., concur.

ATTORNEY FOR APPELLANT

Aaron J. Spolarich
Bennett Boehning & Clary LLP
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana